

## NUMBER 13-19-00442-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI–EDINBURG

### IN THE INTEREST OF S.L.L., A CHILD

### On appeal from the County Court at Law
### of Aransas County, Texas.

### MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Longoria and Perkes
### Memorandum Opinion by Justice Perkes

Appellant S.L. (Mother) challenges the termination of her parental rights to her only

daughter, S.L.L.[1] *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (O), (b)(2). By

what we construe as two issues, Mother argues the evidence is legally and factually

insufficient[2] to support a finding that appellee, the Department of Family and Protective

---

[1] To protect the identity of the minor child, we utilize aliases for the child and related parties. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

[2] Mother does not specify whether she challenges the legal or factual sufficiency of the evidence. Regardless, we address both. *See* TEX. R. APP. P. 38.9; *In re Z.M.M.*, 577 S.W.3d 541, 542–43 (Tex. 2019) (per curiam).

Services (the Department), met its burden to show that: (1) Mother committed one or more statutory predicate acts or omissions under family code § 161.001(b)(1); and (2) termination is in the child's best interest. *See id.* We affirm.

## I. BACKGROUND

According to Brandy Ritter, a family-based safety supervisor with the Department, S.L.L., Mother, and S.L. (Father)[3] were residing together in Aransas Pass, Texas when the Department first intervened in May 2018 after receiving an anonymous tip regarding methamphetamine use and domestic violence in the home.

During a bench trial in August 2019, Ritter testified that the family was initially referred to individual counseling, family counseling, substance abuse assessments, substance abuse therapy, and random drug testing. Ritter stated that neither parent was cooperative at the outset. Mother denied drug use and domestic violence, and Father claimed that counseling was "against his religion." On May 21, 2018, the trial court issued an order for required participation in the Department's services.

Three months later in August 2018, the Department was notified that there had been a domestic violence altercation[4] involving Mother and Father, and law enforcement had been called out to the home for a welfare check. Mother admitted to police, and later to the Department, that she feared for her and S.L.L.'s lives. Arrangements were made to transport Mother and S.L.L. to The Purple Door, a women's shelter in San Antonio, Texas. Mother thereafter remained in contact with Father.

---

[3] The parties do not dispute that Father is S.L.L.'s biological father. According to Mother, Father and Mother separated when she was eight months pregnant with S.L.L. so Father could "try to make it work" with his then-wife for the sake of his two biological children, S.L.L.'s half siblings. Shortly after S.L.L. was born, Father relinquished his parental rights over S.L.L. Therefore, Father is not a party to this suit. Mother and Father reconciled less than a year after Father's parental rights were terminated, and he remains involved in S.L.L.'s life as Mother's paramour.

[4] Neither party expounded on the details of the altercation.

2

Ritter testified, "[Father] was threatening the family, and [saying] that he was going to shoot—that he was planning on shooting [Mother] if she wasn't cooperating with him to go back." Law enforcement intervened in San Antonio before Father could reach Mother's location, and Father was found in possession of a firearm. Within days of Father's arrest, he was bailed out of jail, and Mother, Father, and S.L.L. returned to Aransas Pass together. The family was subsequently evicted from their home for failure to pay past-due rent. In August, Mother tested positive for methamphetamine despite continuing to deny any drug use.

On September 6, 2018, S.L.L. was removed from the home. Ritter testified that the Department removed S.L.L. because: (1) Mother had not been cooperating with services; (2) Mother had tested positive for methamphetamine use; and (3) the Department believed Mother had shown diminished protective abilities by exposing S.L.L. to an unsafe, unstable home environment. According to Ritter, Father suffers from an undisclosed mental illness, and S.L.L. has been exposed to his alarming behaviors. The child has seen Father "acting like people are chasing him, believing things that [sic] are following him, hiding from people, [and] physically harming her mother."

On October 5, 2018, the Department held a family group conference, detailing Mother's goals and expectations for family reunification. Valerie Moretich, S.L.L.'s case worker, testified that Mother was tasked with, among other things: (1) ensuring a home free of domestic violence; (2) participating in child-parent visitations; (3) participating in random drug testing and substance abuse counseling; (4) attending individual counseling; and (5) maintaining stable housing and employment.

Between September 2018 and August 2019, when the bench trial on the merits was held, Mother moved multiple times—residing in Corpus Christi, Houston, San

3

Antonio, and Dallas.[5]  Ritter said Mother remained in contact with the Department and notified the Department anytime she moved or traveled, which she often did to accompany Father to his criminal court proceedings in various counties.  Moretich testified that Mother's inability to maintain residence in one city for a significant period resulted in a delay of service initiation and completion.  Moretich said that every time Mother moved, Mother was aware that "we [had] to restart those services."

By May 2019, Mother had settled in Dallas with Father and his relatives, obtained fulltime employment at a veterinary clinic, and consistently visited her daughter once every other week.  Mother was only permitted two-hour visitations every other Thursday.  Moretich stated that there were no reported incidents during any visitations, and for the exception of a two-month period shortly after Mother moved to Dallas when Mother "was going back and forth to Aransas Pass with [Father]," Mother attended her visitations.  One month before trial, Mother initiated individual counseling services.  One week before trial, Mother began attending substance abuse counseling.

Moretich said that Mother was compliant with random drug testing requests since September 2018, submitting to fifteen urinary analysis requests, all of which returned negative results.  However, Moretich then informed the court that the window for drug detection is seven days for a urinary analysis and that several of Mother's thirteen hair follicle tests, although presenting largely declining levels, were positive for methamphetamine.  Moretich stated Mother's results indicated an "increase" in

---

[5] The testimony was unclear regarding the precise timeline.  However, Mother testified that once S.L.L. was removed from the home in September 2018, she moved to Houston to live with her biological father.  Because the two were unemployed and Mother was without means of transportation to visit S.L.L., Mother moved once more in December 2018 to stay with her own mother in San Antonio.  Mother then determined it was an unfit household because her mother is "unstable" and struggles with substance abuse. After "four or five months," Mother moved again to join Father in Dallas.

4

methamphetamine levels between January and February 2019—eight months after the Department first intervened. The Department did not receive a "clean" hair follicle test from Mother until May 2019.

In late June 2019, in support of Mother's progress to regain custody of S.L.L., Father approached the Department requesting inclusion in the family service plan. Father was asked to complete "an MH-MR screening, substance abuse assessment and counseling, individual counseling for perpetrators of domestic violence, random drug testing, and to maintain a safe and stable home environment." Father, who was on felony probation in two different counties, then tested positive for amphetamines and methamphetamines one month before termination proceedings.

Moretich testified that the Department's concerns regarding Mother's parental fitness stemmed largely from Mother's prioritization of her tumultuous relationship with Father over her daughter. According to Moretich, Father most recently displayed erratic behavior in April 2019 in a purposeful effort to frustrate a mother-daughter reunification. "[Father] had threatened to kill himself and he had threatened to make sure that [Mother] never got [S.L.L.] back. And then she had left him again and several weeks later they were back in a relationship," said Moretich. To date, Mother relies on Father for transportation to and from her employment, her classes, and any time she wishes to leave their home. Mother told Moretich that she plans to marry Father.

Moretich testified that Mother continues to struggle to find a suitable residence, currently relying on the goodwill of Father's relative, M.R. M.R. confirmed that Mother and Father currently reside with her and her husband in Dallas. Although neither Mother nor Father contribute financially to the household, M.R. said "they cook, they clean, they vacuum," and find other ways to help around the home. M.R. maintained that she has

5

seen a change in Mother and Father since they first began living with her. When questioned regarding Father's most recent positive drug test, M.R. stated, "I was told it was a one-time situation that was kind of a mistake, thought maybe he was taking something different. I really don't believe that he went out actively looking for any drugs, I really don't." M.R. stated that "if it ever happens again[,] he has to go," but reiterated that she did not believe Father would relapse.

At trial, Mother was reluctant to discuss her history of domestic violence. Although Mother conceded the existence of several domestic violence "altercations," two of which resulted in protective orders in two different counties that she later withdrew, Mother stated that the incidents were "just arguments" and that she did not "feel comfortable talking about it." Mother could not remember whether Father ever threatened to kill her, and she denied that he ever pointed a gun at her—contrary to her prior protective order affidavit. When asked whether her daughter was ever privy to these unspecified altercations, Mother wavered, first testifying that S.L.L. "was not" in the home at the time. Mother then stated, "She may or may not have been." When pressed, Mother explained, "No, it is a little blurry, that's when we were using." Mother later clarified that the altercations occurred "behind closed doors." While Mother admitted to prior methamphetamine use, she denied using drugs in the home. Mother also denied being aware of any incidents of domestic violence resulting in criminal charges between Father and his ex-wife.

Mother was questioned extensively on her decision to remain in a relationship with Father and stated that she only "intend[s] to continue [being with him] if he's going down the right path." Mother testified she ultimately decided to move back to Dallas to live with Father because he was "drug free, getting himself back together, and stab[le]." She also

6

attributed any of Father's past violent behavior to his drug use. However, when confronted with Father's recent positive drug test, Mother reaffirmed her decision to keep Father in S.L.L.'s life.

> Q. Would you agree that [a] home where someone is using is not a safe home for a child?
>
> A. I do.
>
> Q. So as we said today you don't have a safe and stable home for your child to return to.
>
> A. I mean, if more hair follicles and UAs come up positive[,] I do not.
>
> Q. As of right now [Father] has a positive hair follicle.
>
> A. Yes, he does.
>
> Q. And you're not concerned about that for your daughter?
>
> A. I am, but I've done plenty of hair follicles, they've gone up, they've gone down, that's what I look at.
>
> Q. So you're siding with [Father] at this point.
>
> A. I'm looking over one of his mistakes, yes.

At the time of trial, S.L.L. was eight years old and residing with Father's uncle and aunt, V.R. and P.R., in San Antonio. V.R. described S.L.L. as a happy child, who has recently taken an interest in 4-H and is excelling in school under the gifted and talented program. V.R. said S.L.L. is reluctant to discuss any incidents involving Mother and Father, although she did express that "one time that she was fearful for her mother [sic] something about her dad breaking the windshield trying to get to her, and she remembers just holding on to her dog Diesel and crying." According to V.R., that has been the extent of S.L.L.'s disclosures.

V.R. voiced concerns about Mother's ability to care for S.L.L. because Mother is wholly dependent on Father. V.R. said he initially believed his nephew had been sincere

7

about rehabilitation; however, Father's recent decision to continue to use drugs changed his opinion on Father and, by extension, on Mother's ability to prioritize and care for S.L.L. V.R. said he and his wife were open to adopting S.L.L. and allowing Mother and Father to continue to see S.L.L. even after adoption—provided that they "prove that they're drug-free and currently employed and doing the right thing."

S.L.L. did not testify at trial. Moretich, however, informed the trial court that she discussed conservatorship with S.L.L. Moretich asked S.L.L. how she "would feel if she were to stay where she was," and S.L.L. replied that "she would like to stay [with V.R. and P.R.] as long as she was able to still see her mom."

The trial court determined the Department had proven by clear and convincing evidence that termination was appropriate under Texas Family Code § 161.001(b)(1)(D), (E), and that termination was in S.L.L.'s best interest. *See id.* §§ 161.001(b)(1)(D), (E), (O), (b)(2). This appeal followed.

## II.    THE STATUTORY PREDICATE FINDING

### A.    Standard of Review and Applicable Law

Section 161.001 of the Texas Family Code balances the convergent and divergent interests of a parent's constitutional right to "the companionship, care, custody, and management" of his or her child, *see Stanley v. Illinois*, 405 U.S. 645, 651 (1972), and the necessity of protecting a child's physical and emotional well-being via a promulgated two-part test. *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see also In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) ("[T]he rights of natural parents are not absolute; protection of the child is paramount . . . . The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))).

8

To terminate parental rights, the movant must prove by clear and convincing evidence that (1) the parent committed one or more statutory predicate acts or omissions, and (2) termination is in the child's best interest. *See* TEX. FAM. CODE ANN. §§ 101.007, 161.001(b). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d at 630.

"Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the [fact finder] and considering undisputed contrary evidence, a reasonable [fact finder] could form a firm belief or conviction that the finding was true." *Id.* (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Only when the factual sufficiency of the evidence is challenged, does the inquiry become "whether disputed evidence is such that a reasonable [fact finder] could not have resolved it in favor of the finding." *Id.*

Generally, a single predicate finding under § 161.001(b)(1) of the family code is sufficient to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam). However, a trial court's affirmative finding of endangerment under §§ 161.001(b)(1)(D) or (E)—even when another ground is sufficient for termination—necessitates the appellate court's additional review of (D) or (E) because of the potential consequences for parental rights to a different child. *Id.*

Mother first argues that the evidence is legally and factually insufficient to support a predicate finding under subsections (D), (E), or (O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). While both subsections (D) and (E) focus on

9

endangerment, they differ regarding the source and proof of endangerment, and therefore, we address each subsection in turn. *See In re M.M.*, 584 S.W.3d 885, 889 (Tex. App.—Amarillo 2019, pet. denied).

### B.     Termination under § 161.001(b)(1)(D)

Subsection (D) requires a showing that a parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Endanger "means to expose to loss or injury, to jeopardize." *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam)). "Knowingly" requires that "the parent be aware of but disregard" the potentially endangering environment at issue. *See In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.). It is not necessary, however, that the Department show the child's environment directly threatened or injured the child. *See In re M.M.*, 584 S.W.3d at 889. Further, termination under subsection (D) is permitted on the basis of a single act or omission. *See id.* at 889–90; *In re E.M.*, 494 S.W.3d 209, 221–22 (Tex. App.—Waco 2015, pet. denied).

Evidence of a child's environment before the Department obtained custody, including the acceptability of the child's living conditions and parental conduct in the home, is subsumed in the endangerment analysis. *See In re J.E.M.M*, 532 S.W.3d 874, 880–81 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Likewise, "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home" under subsection (D). *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (quoting *Jordan v. Dossey*, 325

10

S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)); *see also In re E.M.*, 494 S.W.3d at 222 ("Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child.").

Mother contends that "[n]o evidence was introduced, either expert or lay witness evidence, to demonstrate that [she] had ever endangered or neglected her child, or that her behavior was likely to ever endanger or neglect the child." However, Mother's own testimony provided evidence of endangerment prior to the Department's intervention: Mother confirmed Mother and Father's methamphetamine use and domestic violence in the home. *See In re B.M.S.*, 581 S.W.3d 911, 917 (Tex. App.—El Paso 2019, no pet.) (providing that evidence of a parent's use of drugs may qualify as an endangering course of conduct); *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.) (same). Although Mother maintained that any violence was limited to when they were "using" methamphetamine and occurred outside S.L.L.'s presence, the trial court was also privy to contradictory evidence: V.R. testified S.L.L. disclosed an incident when Father broke a windshield trying to assault Mother while S.L.L. was in the vehicle. Furthermore, S.L.L.'s caseworker testified to the severity of the domestic violence, wherein Mother confided that she has feared for her and S.L.L.'s lives on more than one occasion, that she had sought and requested the removal of multiple protective orders against Father, and that weapons were involved in prior disputes.

Evidence of Father's erratic and violent behavior, combined with Mother's persistent willingness to tolerate and excuse such behavior, also supports the endangerment finding. Mother argues on appeal that her repeated decisions to remove herself and her daughter "from the situation" after each incident is indicative of her

protective capabilities. We disagree to the extent that Mother's separation from the relationship was always followed by reconciliation and subsequent patterns of volatility—a hazardous cycle pursued by Mother at the expense of her daughter's physical and emotional well-being. *See In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.) ("A parent's failure to remove himself and his children from a violent relationship endangers the physical or emotional well-being of the children."). We note that evidence of the relationships' instability is further compounded by Father's documented mental illness, which includes reports of Father's behavior in S.L.L.'s presence: "acting like people are chasing him, believing things that are following him, [and] hiding from people."

Considering all the evidence in the light most favorable to the finding, we conclude the trial court could have formed a firm conviction or belief that Mother's past drug use and resolve to remain with an unstable, drug-addicted, abusive individual supports an endangerment finding under subsection (D). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *In re O.E.R.*, 573 S.W.3d 896, 905 (Tex. App.—El Paso 2019, no pet.) (providing that evidence of domestic violence between mother and father was sufficient to establish endangerment under § 161.001(b)(1)(D)); *In re J.E.M.M*, 532 S.W.3d at 881 (same); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (same).

Our factual sufficiency analysis similarly considers many of the disputed aforementioned facts, including the magnitude of the domestic violence and the extent S.L.L. was privy to any violence. We conclude the evidence is factually sufficient to support the subsection (D) finding because the trial court could have reasonably resolved those disputes in favor of that finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *see also In re J.J.L.*, 578 S.W.3d 601, 609 (Tex. App.—Houston [14th Dist.] 2019, no pet.)

12

("We may not second-guess the fact finder's resolution of actual dispute by relying on disputed evidence or evidence the fact finder 'could easily have rejected as not credible.'" (quoting *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003))). Accordingly, we conclude that the evidence was legally and factually sufficient to support termination under subsection (D). TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Issue one is overruled.

### C. Termination Under § 161.001(b)(1)(E)

Under subsection (E), the relevant inquiry is whether evidence exists that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). Unlike subsection (D), a finding under subsection (E) cannot be based on a single act or omission. *See In re P.W.*, 579 S.W.3d 713, 726 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Subsection (E) "requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id.* Like subsection (D), however, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *P.W.*, 579 S.W.3d at 726. A fact finder is also not limited to consideration of the parent's actions before the child has been removed by the Department; any actions or inactions occurring before and after a child was born may be considered, including evidence of a parent's drug use or propensity for violence. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also In re R.S.-T.*, 522 S.W.3d 92, 109–10 (Tex. App.—San Antonio 2017, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment."); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App—Houston [1st Dist.] 2009, pet. denied) (reasoning that a parent's illegal drug use may support termination under subsection (E)

because "it exposes the child to the possibility that the parent may be impaired or imprisoned"). Drug activity can constitute endangerment even if it transpires outside the child's presence. *See J.O.A.*, 283 S.W.3d at 345.

While Mother provided fifteen clean urinary drug tests between September 2018 and July 2019, Mother presented methamphetamine-positive hair follicle results between August 2018 and May 2019. The Department explained that hair follicle tests have a substantially longer window from which drug use may be detected, rendering hair follicle tests more reliable than urinary tests. Moreover, the Department considered Mother's initial refusal to submit to drug testing, and Father's refusal until June 2019, as additional evidence of drug use. *See In re E.R.W.*, 528 S.W.3d at 264–65 ("[A] fact finder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs."); *In re S.C.F.*, 522 S.W.3d 693, 700 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (explaining that a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, "supports a finding that the parent engaged in a course of conduct that endangered the children's physical or emotional well-being.").

In April 2019, as Mother worked towards compliance with the Department's service plan, Father was threatening to "kill himself" and "to make sure that [Mother] never got [S.L.L.] back." Additionally, the Department proffered evidence of Father's June 2019 methamphetamine-positive hair follicle test the month before the final hearing commenced in this case—while he was on felony probation and thereby, risking revocation and a prison sentence—which is especially problematic given the extent to which Mother has chosen to affix her stability to Father's. Evidence indicated that Mother relies on Father for her housing and daily transportation, and that he acts as her support

system although he has repeatedly sought to undermine her reunification efforts with her daughter.

Reviewing all the evidence in the light most favorable to the termination finding under subsection (E), we conclude that a reasonable fact finder could have formed a firm belief or conviction that Mother engaged in conduct or knowingly placed S.L.L. with persons who engaged in conduct which endangered the child's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *In re J.O.A.*, 283 S.W.3d at 344. Further, although Mother denied, declined to disclose, or attempted to minimize the domestic violence altercations which transpired and methamphetamine use by either herself or Father, it was within the purview of the trial court to determine Mother's credibility. *See In re N.H.N.*, 580 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (according due deference to the trial court's credibility determinations). Having reviewed the entire record, we conclude the disputed evidence is not so significant that the trial court, as fact finder, could not have formed a firm belief or conviction that Mother's conduct endangered S.L.L. *In re J.F.C.*, 96 S.W.3d at 266. We conclude the evidence is legally and factually sufficient to support the termination finding under subsection (E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). We overrule Mother's second issue.[6]

### III. THE CHILD'S BEST INTEREST

### A. Applicable Law

As previously established, in addition to a predicate violation, the Department must prove by clear and convincing evidence that termination is in the child's best interest.

---

[6] Having already found sufficient evidence to support a finding under subsections (D) and (E), we need not address whether termination was appropriate under subsection (O). *See In re N.G.*, 577 S.W.3d at 234.

15

*See* Tex. Fam. Code Ann. § 161.001(b)(2); *see also id.* § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.").

A fact finder may consider a number of factors to determine the child's best interest, including the child's desires, the child's present and future physical and emotional needs, the present and future emotional and physical danger to the child, the parental abilities of the people seeking custody, programs available to assist those people in promoting the child's best interest, plans for the child by those people or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re E.N.C.*, 384 S.W.3d 796, 807–08 (Tex. 2012) (reciting the *Holley* factors). Our "best interest" analysis is not limited to these *Holley* factors, and the absence of evidence regarding some of the factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

## B.    *Holley* Analysis

As to the first factor, S.L.L. did not testify, *see Holley*, 544 S.W.2d at 371–72, but her caseworker informed the court of her wishes to remain living with her uncle and aunt and to remain in contact with Mother. *See* Tex. Fam. Code Ann. § 263.307(b)(1). Moreover, although Mother's visitations with S.L.L. were limited to every other Thursday,[7] the Department did not dispute that Mother and S.L.L. were bonded and instead raised

---

[7] There was no evidence of Mother's visitation schedule or frequency in the months prior to her move to Dallas.

16

concerns of Mother's repeated prioritization of Father over her daughter and the dangerous implications as applied to other *Holley* factors discussed in greater detail below.

A review of Mother's performance under her service plan furthers an analysis of several of the *Holley* factors, including the emotional and physical danger to the child now and in the future, parental abilities, and stability. *See Holley*, 544 S.W.2d at 371–72; *In re J.L.C.*, 582 S.W.3d 421, 432–33 (Tex. App.—Amarillo 2018, pet. ref'd) (noting failure to comply with family service plan supports finding that termination is in best interest of child); *see also* TEX. FAM. CODE ANN. § 263.307(b)(10)–(12) (providing that, in determining whether parents are willing and able to provide the child with a safe environment, the court should consider "the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision"; "the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time"; and whether the family "demonstrates adequate parenting skills").

As previously noted, the Department prepared a service plan for Mother that required her, in part, to: (1) obtain and maintain employment; (2) participate in a mental health assessment and in individual therapy; (3) complete classes on domestic violence and substance abuse; (4) submit to random drug tests; (5) attend visitations with her daughter; and (6) obtain and maintain safe and stable housing free of domestic violence. *See* TEX. FAM. CODE ANN. §§ 263.307(b)(10)–(12); *Holley*, 544 S.W.2d at 371–72; *In re S.B.*, 207 S.W.3d at 887–88. However, much of Mother's compliance with the plan occurred in the three months preceding trial. *See In re J.L.C.*, 582 S.W.3d at 432–33; *see also In re R.L.L.*, No. 04-18-00240-CV, 2018 WL 6069866, at *14 (Tex. App.—San

17

Antonio Nov. 21, 2018, pet. denied) (mem. op.) (noting Mother's delay in beginning services as consideration for best interest determination). Mother obtained fulltime employment three months before trial. Mother initiated individual therapy one month before trial. Mother began substance abuse counseling one week before trial. With respect to her visitation requirements, Mother attended visitations without issue for three months before trial but was absent from visitations for a two-month period prior to that, and there was no evidence regarding visitations before Mother moved to Dallas.

Mother alternatively asserts that she has satisfied the Department's requirement that she obtain and maintain safe and stable housing in a drug and domestic violence-free environment. Yet, the evidence indicates that the reason for the Department's intervention—methamphetamine use and domestic violence in the home—continued one year after service initiation. *See Holley*, 544 S.W.2d at 371–72; *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (noting a parent's drug use supports finding that termination is in best interest of child); *In re O.N.H.*, 401 S.W.3d 681, 684–85 (Tex. App.—San Antonio 2013, no pet.) (stating that simply exposing a child to the other parent's violence is a relevant consideration in determining a child's best interest); *see also In re R.J.*, 579 S.W.3d 97, 118 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("While mental illness is not a ground for parental termination, the impact of a parent's mental illness on his ability to parent and the stability of the home are relevant factors in the best interest of the child analysis."). The trial court may also have inferred that past endangering conduct may occur again in the future if the child is returned to Mother. *See In re J.B.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also In re C.H.*, 89 S.W.3d at 27 (holding the same evidence supporting

termination under one of the grounds listed in § 161.001(b)(1) may be probative in a best interest determination).

Further, Mother's current residential stability is problematically dependent on Father abstaining from methamphetamine use.   Given Father's failure to demonstrate a sustained period of sobriety, Mother's housing situation remains as indeterminate as it was in the year leading up to the termination hearing when Mother frequently moved. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (noting parent's inability to provide stable home supports finding that termination is in best interest of child); *see also A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.) (providing that conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child).

The stability of S.L.L.'s proposed home environment is a similarly significant consideration in determining whether termination of parental rights is in her best interest. *In re J.G.S.*, 574 S.W.3d 101, 126 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Stability and permanence are paramount in the upbringing of children.").   S.L.L. is doing exceedingly well in her current placement, testing into the school's gifted and talented program and pursuing community-based interests.   The Department also presented evidence that the family is open to adoption.   There was no testimony regarding Mother's plans for her child following reunification.   *See Holley*, 544 S.W.2d at 371–72; *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.).

With regard to the final *Holley* factors, although Mother has taken steps to improve her life, *see In re R.J.*, 579 S.W.3d at 119, Mother's acts and omissions, as well as her excuses, at minimum, suggest an undervalued mother-child relationship.   *See Holley*,

19

544 S.W.2d at 371–72; *In re N.J.H.*, 575 S.W.3d 822, 832 (Tex. App.—Houston [1st Dist.] Dec. 18, 2018, pet. denied) ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices." (quoting *In re J.O.A.*, 283 S.W.3d at 346)); *see also In re D.W.*, 445 S.W.3d 913, 932 (Tex. App.—Dallas 2014, pet. denied) (providing that evidence considered in other *Holley* factors may be relevant in analyzing the final two factors). Mother has shown she lacks "protective capacity over her daughter" by prioritizing a volatile, drug-addled relationship with Father to her own detriment and at her daughter's expense. As consequence, Mother lacks the parental ability and stability to meet the current and future needs of her daughter.

Having analyzed the evidence under the applicable law and appropriate standards of review, we conclude that a reasonable trier of fact could form a firm belief or conviction that termination was in the best interest of S.L.L. We likewise conclude that any disputed evidence regarding the *Holley* factors is not so significant that it would prevent a reasonable fact finder from forming a firm belief or conviction. *See Holley*, 544 S.W.2d at 371–72. We overrule Mother's last issue.

### IV. CONCLUSION

We affirm the trial court's judgment.

GREGORY T. PERKES
Justice

Delivered and filed the 9th
day of January, 2020.